**O**

# United States District Court
# Central District of California

RAYMOND KOVACIC and JARED KOVACIC,

              Plaintiffs,

     v.

COUNTY OF LOS ANGELES; EDWARD J. McDONALD; JACQUES LaBERGE; PATRICK S. DAVOREN; MICHAEL K. WILLIAMS; JONATHAN BODEN; TRACY KOERNER; CASEY McKAY; ANTHONY MYERS; CHRISTOPHER REDENBAUGH; and DOES 1–10, inclusive,

              Defendants.

Case № 2:14-cv-07765-ODW (PJWx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [46]**

## I.  INTRODUCTION

Plaintiffs Raymond and Jared Kovacic claim that the Los Angeles County Sheriff's Department ("LASD"), and its individual officers, violated their constitutional rights when the officers surrounded their Westlake Village home in the middle of the night, guns drawn, and detained them without reasonable suspicion.

Defendants argue that the officers had reasonable suspicion—they were investigating a perceived home invasion.

Now before the Court is Defendants' Motion for Summary Judgment or, in the alternative, Motion for Partial Summary Judgment. (ECF No. 46.).[1] For the foregoing reasons, the Court **GRANTS** the Motion as to Plaintiffs' claims for violation of the First Amendment, violation of California Civil Code Section 51.2, Failure to Train, and Municipal Liability, and also as to Defendants LaBerge and Davoren on all counts. The Court **DENIES** the remainder Defendants' Motion.

## II.   FACTUAL BACKGROUND

In the early morning of July 31, 2013, Plaintiff Raymond Kovacic and his then-17-year-old son Jared Kovacic were entertaining guests in their home on the corner of Yorkfield Court and Village Center Road in Westlake Village, California. (Raymond Kovacic ("Raymond") Decl. ¶ 4, 6–7, ECF No. 68.) Raymond is the owner of the property. (*Id.* ¶¶ 3–4.) That evening, the father and son hosted one of Jared's friends, Spencer White, and Raymond's cousin, Adam Weinberger, along with three of Weinberger's friends from Australia. (*Id.* ¶¶ 8–9.) Raymond is and was a federal law enforcement officer employed by United States Immigration and Customs Enforcement. (*Id.* ¶¶ 1–2.) Apart from a metal gate marking the pathway to the front courtyard and the driveway, the home is completely surrounded by a block wall measuring no less than seven feet high. (*Id.* ¶ 5; Opposition to Def. Mot. For Summ. J., Exs. A–B, ECF No. 58.[2])

Between 12 a.m. and 1 a.m., Raymond was in his second-floor bedroom; his

---

[1] After carefully considering the moving papers and Plaintiffs' opposition, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

[2] The Court struck this document, along with all other opposition documents, as being improperly and untimely filed, and ordered Plaintiffs to resubmit the documents. (ECF No. 66.) While Plaintiffs refiled all other opposition documents, it appears Plaintiffs forgot to resubmit this particular document. However, the Court, pursuant to its inherent authority to reconsider its own orders, will accept the exhibits filed in ECF No. 58, including the photographs mentioned herein. *See, e.g.*, *United States v. Martin*, 226 F.3d 1042, 1049 (9th Cir. 2000); *Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958-B (BLM), 2008 WL 2705161, at *1 (S.D. Cal. July 7, 2008).

window was open and he was not yet asleep.  (Raymond Kovacic Dep. ("Raymond Dep.") 26:5–24, Def. Index of Evidence in Support of Summ. J., Ex. D, ECF No. 46; Raymond Decl. ¶ 10.)  Jared and Spencer were in Jared's first floor bedroom playing video games.  (Jared Kovacic Dep. ("Jared Dep.") 51:23–52:10, Def. Index of Evidence in Support of Summ. J., Ex. E, ECF No. 46.)  One of the out-of-town guests was staying in an upstairs bedroom with the remaining three in the living room on the first floor.  (*Id.* 52:11–13; Raymond Dep. 33:15–20.)  This living room has a sliding glass door leading to the home's backyard.  (Jared Dep. 54:3–16.)  While the Kovacics and their guests enjoyed their evening, Los Angeles Sheriff's Deputies Jonathan Boden and Christopher Redenbaugh were on patrol in their vehicle in Westlake Village.  (Defendants' Statement of Undisputed Facts ("Def. SUF") ¶ 12, ECF No. 46-2.)  Many of the facts on which parties agree, however, end here.

The Defendant deputies claim that they heard a loud "crashing" noise as they rolled through the neighborhood with their windows down.  (Jonathan Boden Dep. ("Boden Dep.") 9:2–21, Def. Index of Evidence in Support of Summ. J., Ex. G, ECF No. 46; Christopher Redenbaugh Dep. ("Redenbaugh Dep.) 10:11–12, Def. Index of Evidence in Support of Summ. J., Ex. H, ECF No. 46.)  Believing the noise to be a crashing barbeque or piece of patio furniture, the deputies stopped and exited their vehicle to investigate.  (Boden Dep. 9:13–14.)  The two believed that the sound came from the vicinity of the Kovacic residence.  (*Id.* 9:2–7.)  At 1:08 a.m., the deputies radioed to dispatch that they were "Code 6" (out for investigation) and gave their location.  (Def. SUF ¶ 17.)  Approaching the front of the Kovacic home, Deputy Boden testified that, through a front window, he observed a person holding what appeared to be a flashlight, going through drawers, and placing items into a bag.  (Boden Dep. 17:12–18:4.)  Given the time of night, the two believed that the figure was that of a burglar in the midst of a home invasion.  (*Id.* 50:16–19.)  At 1:10 a.m., they radioed for back-up and reported the possible burglary to dispatch.  (Redenbaugh Dep. 18:20–22.)  Sergeant Edward McDonald and Deputies Casey McKay, Stephen

O'Neal, Tracy Koerner, and Anthony Myers responded to the call, and the Sheriff's Department dispatched a helicopter to the community vicinity. (Def. SUF ¶¶ 24–25.) With back-up in place, the officers set up a containment area around the Kovacic residence and switched to a more private radio frequency. (Redenbaugh Dep. 19:9–11.)

Meanwhile, inside the Kovacic home, Raymond claims that he heard no "crash," or any sound at all until, between 1 a.m. and 1:30 a.m., he heard what sounded like a police radio coming from outside. (Raymond Decl. ¶¶ 11–12.) He looked out of his bedroom window but saw nothing; he then put on a pair of cargo shorts, a University of Southern California sweatshirt, a pair of slippers, and his eyeglasses. (Raymond Dep. 28:3–11.) Though he owns firearms as a law enforcement officer himself, Raymond did not bring a gun with him when he exited his bedroom. (*Id.* 37:12–22.) Raymond also put his wallet in his pocket before walking downstairs to investigate the noise. (*Id.* 28:3–11; Raymond Decl. ¶ 14.)

Reaching the entryway, he turned on the front entryway lights and opened his front door, where he was immediately confronted with flashlights shining into his eyes and the sounds of officers drawing their weapons, shouting at him, and ordering him to exit his home and get on his knees. (Raymond Dep. 39:3–11.) One of the deputies, either Boden or Redenbaugh, handcuffed Kovacic and patted him down to search for weapons. (Redenbaugh Dep. 23:4–24:4; Boden Dep. 53:20–22.) Deputy Boden admits that he felt a wallet in Raymond's pocket, but claims he did not remove it because Raymond did not give him "permission" to remove the wallet from the pocket. (Def. SUF ¶ 41; Raymond Dep. 51:15–22.) In order to ascertain the identity of their suspect, Deputy Redenbaugh asked Raymond if he lived at the residence; Raymond responded in the affirmative. (Def. SUF ¶ 43; Redenbaugh Dep. 24:13–15.) Deputy Redenbaugh then allegedly asked Raymond to state his name and date of birth, and he claims that Raymond's response was a terse, "the only thing you fuckin' need to know is that I live here." (*Id.* 24:15–19.) Raymond rejects this

characterization of their exchange, and insists that at no time was he asked to provide his name. (Raymond Decl. ¶ 32.) He does, however, insist that he repeatedly told the deputies that his identification was in his wallet, and that he was the owner of the home. (*Id.* ¶¶ 28–29.) He also maintains that at no time did he speak or act in a hostile manner. (*Id.* ¶ 23; *but see* Boden Dep. 52: 12–14.) Raymond maintains that he purposefully did not engage the deputies in a conversation until the deputies lowered their weapons and he was away from his front courtyard entry. (Raymond Dep. 51:4–7.)

After standing Raymond up, the deputies escorted him away from the house and toward their patrol vehicle. (Raymond Decl. ¶ 25.) Raymond claims he told the officer[3] that he was a member of law enforcement and that he lived in the house; the deputy alleged retorted, "You should have told us that sooner." (Raymond Dep. 51:10–14.) At approximately 1:35 a.m., the deputies placed Raymond in the backseat of a patrol vehicle, at which point Raymond allegedly asked a deputy why he was there and what was going on; the deputy purportedly told him to "shut the fuck up." (Def. SUF ¶¶ 47; Raymond Dep. 98:2–6.) Raymond testified that the handcuffing officer secured the cuffs in an extremely tight manner and that his hands went numb. (*Id.* 48:15–16.) At no point did Raymond complain to the deputies about the tightness of his restraints. (*Id.* 49:3–5.)

With Raymond now in the back of the patrol vehicle, Jared Kovacic opened the front door to see what was going on. (Jared Dep. 63:8–64:2, 68:6–10.) Jared was wearing nothing more than a pair of boxer shorts and a t-shirt. (Jared Kovacic Decl. ("Jared Decl.") ¶ 28, ECF No. 69.) Upon opening the door, Jared saw several deputies with guns drawn, and the Defendants immediately ordered him to place his hands on his head, walk backward toward the deputies, and kneel down. (Jared Dep. 64:13–25, 68:17–24.) Jared testified that four or five officers had their weapons

---

[3] Though unidentified, Raymond believes the officer to be Deputy Boden. (Raymond Decl. ¶ 25 n.5.)

drawn, and that one particular officer had his firearm pointed "not even a foot away" from his head.  (*Id.* 68:20–25; Jared Kovacic Dep. (Plaintiffs' Jared Dep.") 69:1–15, Opposition to Def. Mot. For Summ. J., Ex. E, ECF No. 58.)  He contends that the other officers' weapons were approximately six feet away.  (*Id.* 69:16–20.)  While still on his knees, an unknown deputy placed a knee on Jared's calf while either Deputy Boden or Redenbaugh handcuffed him.  (Jared Dep. 71:16–20.)  During the cuffing, Sergeant McDonald approached Jared and allegedly said, "We got you, Fred."  (*Id.* 72:13–16.)  After Jared said he was not, in fact, Fred, the Sergeant replied, "Well, if you're not Fred, then where's your sister?"  (*Id.* 72:21–24.)  Jared responded by saying that he does not have a sister.  (*Id.*)

The deputies escorted Jared to the curb, where he was told to sit.  (*Id.* 23:15–20.)  Three of the four remaining guests then exited the home and were subsequently handcuffed and seated next to Jared on the curb.  (*Id.* 74:16–19, 83:13–25.)  After claiming to see movement inside the home at 1:41 a.m., the deputies asked Jared and the Australian guests outside if anyone else was still inside; they told the officers that Raymond's cousin, Stephen Weinberger, was still inside and that he was a heavy sleeper.  (Jared Decl. ¶ 52.)  After first calling to Weinberger with a bullhorn and threatening to send in an attack dog if he did not comply, Deputies Boden, Redenbaugh, and McKay entered the home to "clear" the area.  (Def. SUF ¶¶ 59–61; Boden Dep. 47:5–11; Milan Filipovic Decl. ¶ 31, ECF No. 70.)  Only after the sweep of the home began did the Defendants allegedly determine that Raymond Kovacic was, in fact, the owner of the home.  (Def. SUF ¶ 64.)  Sergeant McDonald then told the deputies inside the residence to exit, and Raymond, Jared, and the houseguests were released from their handcuffs.  (*Id.* ¶¶ 65–66.)  Raymond claims that Sergeant McDonald informed him that he was to be released, and that the Sergeant told him "not to make a scene until we get the kids out of here."  (Raymond Dep. 62:5–9.)  Raymond responded by saying, "Excuse me?  You just had me cuffed in the back of this car for 45 minutes and went through my home and you're going to tell me not to

make a scene?" (*Id.* 62:10–14.)

At 1:52 a.m., Defendants advised dispatch and the circling helicopter that no further assistance was required. (Def. SUF ¶ 67.) After being released, Deputy Redenbaugh claims that one of the houseguests told him that he had "accidentally slammed" one of the sliding glass doors in the Kovacic residence, and that he had been using his cellphone flashlight to pack his bags without waking the other guests.[4] (Redenbaugh Dep. 34:20–35:8.) Sergeant McDonald later approached Raymond and explained that the deputies were responding to a security alarm—Raymond, in turn, informed the Sergeant that he did not have a security alarm system. (Raymond Decl. ¶¶ 56–57.) The Sergeant then allegedly conferred with his deputies and changed his story: the deputies had heard a loud "crash" coming from the vicinity of the residence. (*Id.* ¶¶ 58–59.) When Raymond heard this new explanation for the night's events, he questioned Sergeant McDonald and asked if the deputies could have really heard a "crash" as they were driving down Village Center Drive going 20- to 30-miles an hour. (Raymond Kovacic Dep. ("Plaintiffs' Raymond Dep.") 88:1–5, Ex. D in Opposition to Def. Mot. For Summ. J., ECF No. 58.) The Sergeant unresponsively replied by repeating "this wasn't a training mission" and "it wasn't an exercise." (*Id.* 88:6–11.) According to Raymond, Sergeant McDonald then told Raymond, "Look these are two of my best guys. They're a little zealous, but they're really good. I'd hate to see anything happen to them." (*Id.* 88:12–15.) When Raymond requested a copy of the incident report, Sergeant McDonald told him, "oh, well, that's easy. I'll tell you right now there won't be one." (*Id.* 88:17–21.) Raymond then reminded him that, with all these officers, his child on the ground, and a helicopter flying overhead, that there should be an incident report; the Sergeant responded by saying, "No, there

---

[4] The houseguest in question, Milan Filipovic, rejects this contention. (Filipovic Decl. ¶¶ 39–40.) Filipovic claims that, after the officers exited the house following their sweep and after all the guests were released, one of the deputies asked him to provide a statement. (*Id.* ¶ 34.) In that statement, Filipovic said that, just an hour or two before, he had used a small, handheld flashlight to retrieve an item from his duffel bag. (*Id.* ¶ 35.) He claims that at no point did he hear any loud crashing noises or make any such noises himself. (*Id.* ¶¶ 13, 39–40.)

was no incident." (*Id.* 88:22–89:3.)

When Raymond re-entered his home after the officers departed, he claims that the cupboard doors were open, and that they were closed before the deputies searched his property. (Raymond Decl. ¶¶ 68–69.) No charges were ever brought against Raymond Kovacic, his son, or any of their houseguests in connection with the July 31, 2013 incident. (Raymond Dep. 90:5–7.) No incident report was generated for the event. (Def. SUF ¶ 79.)

## III.   PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint in this Court on October 7, 2014, alleging violations of their Fourth and First Amendment rights pursuant to 42 U.S.C. § 1983 and related state law claims. (ECF No. 1.) Plaintiffs amended their Complaint on December 1, 2014 and again on June 3, 2015. (ECF Nos. 16, 29.) Defendants moved for summary judgment on all claims on January 4, 2016. (ECF No. 46.) While Plaintiffs failed to timely oppose the motion, the Court allowed Plaintiffs to file their tardy materials and Defendants filed a timely reply. (ECF Nos. 51–64, 66–78, 80.) Defendants' motion is now before the Court for decision.

## IV.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." *Lujan v. Nat'l Wildlife*

*Fed'n*, 498 U.S. 871, 888 (1990); *see also Celotex*, 477 U.S. at 324.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id* at 322; *see also Abromson v. Am. Pac. Corp.*, 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law.  *T.W. Elec. Serv., Inc. v. Pac Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  When deciding a motion for summary judgment, "the interferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(citation omitted); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.*, 121 F.3d 1332, 1335 (9th Cir. 1997).  Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  *Matsushita*, 475 U.S. at 587.

## V.   DISCUSSION

Plaintiffs' Second Amended Complaint ("SAC") asserts twelve claims for relief and seeks compensatory and punitive damages.  (ECF No. 29.)  Since Defendants maintain that no genuine issues of material fact with respect to any cause of action, the Court will address each claim in turn.

### A. Fourth Amendment: Unreasonable Seizure (under § 1983); False Arrest; False Imprisonment

The Fourth Amendment prohibits "unreasonable searches and seizures" by government actors, and its protections "extend to brief investigatory stops of persons or vehicles that fall short of a traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  Where an officer detains an individual for purposes of investigation, that stop must be both brief and supported by "reasonable suspicion" that the individual is engaged in criminal activity.  *Terry*,

392 U.S. at 23–27.   However, a lawful detention will be converted into an arrest where the detention is effectuated in an unreasonable manner or for an unreasonable length of time.  *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).  For an arrest, reasonable suspicion will not suffice; the officers must have probable cause as justification for their actions.  *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002).

There is no question that Raymond and Jared's detentions by the Los Angeles Sheriff's deputies amounted to a seizure for Fourth Amendment purposes, as a reasonable person in their situation would not have felt free "to disregard the police and go about his business."  *Cal. v. Hodari*, 499 U.S. 621, 628 (1991); *see also Gallegos*, 308 F.3d at 990.  However, because the Court finds that genuine issues of material fact exist as to whether the Defendant Deputies had even reasonable suspicion to detain Plaintiffs, the Court need not determine whether their detentions amounted to arrests.

Where an officer is presented with "specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person is engaged in criminal activity," the reasonable suspicion threshold is met.  *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996).  Courts look at the totality of the circumstances when determining whether an officer had reasonable suspicion to seize an individual.  *United States v. Osborn*, 203 F.3d 1176, 1181 (9th Cir. 2000).

Plaintiffs here have sufficiently raised material facts as to whether Defendants had reasonable suspicion to seize and handcuff Raymond and Jared Kovacic.  Even if the Court accepts Deputies Boden and Redenbaugh's claims that they heard a "crash" and then saw through a seven-foot tall brick wall and into the Kovacic living room, where a burglar-esque figure was holding a flashlight and placing items in a bag—and for the Court to accept this tale would give Defendants far more benefit of the doubt than their story deserves—additional facts draw into question the existence of

reasonable suspicion.  (*See* Opposition to Def. Mot. For Summ. J., Exs. A–B; Boden Dep. 9:2–21.)

It is in dispute that an officer could reasonably believe that a burglar, who after hearing police radios outside, would walk out the front door, clad in slippers and a sweatshirt, and throw on all the lights.  (*See* Raymond Dep. 28:3–11; 39:3–11.)  To the contrary, any suspected burglar worth his salt would be jumping that seven-foot wall and fleeing out the back.  And even if the deputies had reasonable suspicion to detain Raymond, they certainly did not have the requisite level of suspicion to detain his teenage son.  Jared emerged from the home just a few minutes after his father; he too was dressed rather un-burglar-like in his boxer shorts and t-shirt.  (Jared Decl. ¶ 28.)  What burglar runs toward the sounds of shouting officers, and do so in his underwear?  Moreover, the Court must look at the totality of the circumstances, *Osborn*, 203 F.3d at 1181, and Defendants' comments calling Jared "Fred" and their questions about his nonexistent "sister" put Defendants' reasonable suspicion claims in doubt.  (*See* Jared Dep. 72:13–16, 72:21–24.)  Did the officers truly believe Jared was this "Fred" character?  A jury should decide.

Accordingly, the Court finds genuine issues of material fact as to whether Defendants possessed the required reasonable suspicion to detain Raymond and Jared Kovacic, and thus summary judgment on the Fourth Amendment unreasonable seizure claim is **DENIED**.

Moreover, Plaintiffs' state law claims likewise survive summary judgment. The "right to be free from unlawful seizure has common law analogues in the torts of false arrest and false imprisonment." *Cnty. of Los Angeles v. Super. Ct.*, 78 Cal. App. 4th 212, 228 (2000).  Relying on the same underlying analysis, the Court finds that there are genuine issues of material fact as to whether Defendants possessed lawful privilege to detain Plaintiffs, and thus the false arrest and false imprisonment claims also survive summary judgment.

**B. Fourth Amendment: Excessive Use of Force (under § 1983); Assault;**

**Battery**

Excessive use of force incident to a search or seizure violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). The means by which an officer effectuates a detention or investigation can constitute excessive force, and courts should pay special attention to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) (holding that the reasonableness question asks "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure")).

The Court declines to conclude as a matter of law that Defendants' use of force as to Raymond Kovacic was reasonable under the circumstances. Excessive force claims will usually present jury questions, and only after resolving all facts in favor of the plaintiff, and only where the Defendant's actions were objectively reasonable under the circumstances, is summary judgment appropriate. *Shaw v. City of Redondo Beach*, No. CV05-0481-SVW (FMOx), 2005 WL 6117549, at *8 (C.D. Cal. Aug. 23, 2005) (citing *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000); *Alexander v. Cnty. of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995)). According to the facts as testified to by Raymond, it is impossible to say that the only reasonable conclusion that the evidence permits is that Defendants used reasonable force. Therefore, the claim should go to the jury. *See LaLonde*, 204 F.3d at 360.

Given Raymond's attire and his actions upon exiting his home, it may have been unreasonable for Defendants to restrain him in the absence of reasonable

suspicion of wrongdoing. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015) ("*Graham* counsels that the facts that gave rise to an unlawful detention or arrest can factor into the determination whether the force used to make the arrest was excessive." (citing *Graham*, 490 U.S. at 394–37)). Moreover, Raymond alleges that he told the deputies that he had his identification and proof of residency in his wallet. (Raymond Decl. ¶¶ 28–29.) For the deputies to keep him in handcuffs and refuse to verify his address may have been unreasonable under the circumstances, and the Court therefore hands this determination to the factfinder. (*See* Def. SUF ¶ 41; Raymond Dep. 51:15–22 (Deputy Boden's admission that he felt a wallet in Raymond's pocket, but did not remove it because Raymond did not give him "permission" to remove the wallet from the pocket).)

Moreover, the Court finds genuine issues of material fact as to whether Defendants used excessive force against Jared Kovacic. Where officers point their weapons at an out-numbered and an apparently unarmed individual who is under investigation for at most a misdemeanor, and where there are no dangerous or exigent circumstances present, the detention violates the Fourth Amendment. *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc). While the Court acknowledges that burglary is a felony under California law, Cal. Penal Code § 461, the fact that Defendants may have pointed their service weapons at the head of a minor where there was no indication that the child was armed or even uncooperative raises serious questions about the reasonableness of their actions. In *Robinson*, the Ninth Circuit held that "pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger." *Id.* at 1015; *see also Hopkins v. Bonvicino*, 573 F.3d 752, 776 (9th Cir. 2009). Jared claims that four or five officers had their weapons drawn when he opened his front door, and that one deputy had his firearm "not even a foot away from his head." (Jared Dep. 64:13–25, 68:17–25; Plaintiffs' Jared Dep. 69:1–20.) Given the other facts known to the officers at this time—that

Jared was clearly a resident in the home considering he was wearing nothing more than boxers and a t-shirt; that both he and his father had voluntarily exited their home; and that neither man gave any indications of a propensity toward violence—genuine issues of material fact exist as to whether Defendants' use of force was excessive under the circumstances.[5]

Finally, because battery and assault claims flowing from the same facts as an excessive force claim are governed by the same reasonableness standard in the Fourth Amendment analysis, the Court likewise **DENIES** Defendants' Motion for Summary Judgment as to the related state law claims.  *See Evans v. City of San Diego*, 913 F. Supp. 2d 986, 999 (S.D. Cal. 2012) (citing *Atkinson v. Cnty. of Tulare*, 790 F. Supp. 2d 1188, 1211 (E.D. Cal. 2011)).

### C. Fourth Amendment: Unreasonable Search of Private Residence and Unlawful Entry (under § 1983); Trespass

It is well-settled that the home is sacrosanct and, absent a warrant based on probable cause, the search of a private residence is presumptively unreasonable under the Fourth Amendment.  *Kyllo v. United States*, 533 U.S. 27, 31 (2001); *Payton v. New York*, 445 U.S. 573 (1980).  However, the Fourth Amendment does not prohibit all warrantless searches; where certain exceptions apply, the presumption of unreasonableness may be overcome.  Defendants argue that their search of the Kovacic residence falls under one of these exceptions, and that the search was lawful either as one incident to a lawful arrest or due to exigent circumstances.  (Mot. 17–18.)  Because the Court finds genuine issues of material fact as to whether either of these exceptions applies, Plaintiffs' Fourth Amendment unreasonable search and state tort trespass claims survive summary judgment.

Police may conduct a "protective sweep" of the premises when (1) the sweep is incident to arrest, and (2) conducted for the purposes of ensuring the safety of the

---

[5] As discussed *infra*, the Court declines to conclude as a matter of law that exigent circumstances were present on the night in question.

officers. *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  The sweep must last "no longer than necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36.  As is clear from above, the Court finds genuine issues of material fact as to whether Defendants possessed reasonable suspicion for Plaintiffs' detention, let alone the probable cause required for an arrest.  Therefore, any sweep of the premises would not have been incident to a lawful arrest—and unlawful.   However, even if the circumstances surrounding Plaintiffs' detentions converted them into arrests, and those arrests were deemed lawful, Defendants' search of the Kovacic home could not reasonably be attributed to officer safety.  By the time the Defendants ordered a sweep of the property to find the remaining occupant, Defendants knew that: (1) Raymond and Jared could not reasonably be deemed burglars (see above); (2) Raymond had repeatedly told the officers that he was the owner of the house and had ample opportunity to inspect his drivers' license; and (3) Jared and the Australian guests had told the deputies that, while a fourth guest remained inside, he was Raymond's cousin and a heavy sleeper.  (Raymond Decl. ¶¶ 28–29; Jared Decl. ¶ 52.)   Given these additional facts, it seems likely that Defendants knew that a sweep was not necessary to ensure their safety.

Similarly, Defendants' exigent circumstances arguments do not surpass the summary judgment burden.  The Ninth Circuit recognizes certain exceptions to the warrant requirement before searching a home or its curtilage, including exigent circumstances and emergency exceptions. *Hopkins v. Bonvicino*, 573 F.3d 752,763 (9th Cir. 2009).  The exigent circumstances exception allows officers to commit a warrantless entry where "necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Id.* at 763; *United States v. Ojeda*, 276 F.3d 486,488 (9th Cir. 2002).  Defendants claim the sweep was necessary to apprehend a potential burglar inside the home.  (Mot. 18.)  However, as with the officer safety rationale, the

Court is not persuaded, given the totality of the circumstances, that a sleeping houseguest constitutes "exigent circumstances."

Finally, the emergency exception allows officers to enter a home where they have "an objectively reasonable basis for concluding that there is an immediate need to protect others or themselves from serious harm." *Hopkins*, 573 F.3d. at 764. Defendants have failed to show that a warrantless search of Plaintiffs' home was "objectively reasonable" under the circumstances.  The "government bears a heavy burden of demonstrating that exceptional circumstances justified departure from the warrant requirement."  *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987) (quoting *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985). Here, the Court concludes that Defendants' need to root out "possible" suspects inside the home did not justify the search.  (*See* Mot. 18.)   Again, by the time Defendants entered the Kovacic home, they knew no potential threats remained inside—in fact, the now-restrained guests told the deputies before the search that only Stephen Weinberger, Raymond's fast-asleep cousin, remained. (Raymond Decl. ¶¶ 28–29; Jared Decl. ¶ 52.)  Unless Defendants see a dangerous threat in a slumberer from Down Under that the Court does not, the search was not objectively reasonable under the circumstances. Defendants' motion as to the Fourth Amendment Unreasonable Search claim is therefore **DENIED**.

Furthermore, the genuine disputes of material fact infect Plaintiffs' state law claim as well.  "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another."  *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004, 1042 (2009) (quoting *Civic Western Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 16 (1977)) (internal quotation marks omitted).  Where a person's detention is unauthorized, so too is the subsequent intrusion into their home. *Gonzales v. City of San Jose*, No. 13-CV-00695-BLF, 2015 WL 2398407, at *11 (N.D. Cal. May 19, 2015).  According, Defendants' Motion as to the state law trespass claim is **DENIED**.

**D. Fourth Amendment: Unreasonable Search of Person (under § 1983)**

Under *Terry v. Ohio*, an officer may pat down the outer clothing of detained persons who they reasonably believe may be armed and dangerous.  392 U.S. at 27. As reiterated above, genuine issues of material fact exist as to whether Defendants could have reasonably believed that Raymond and Jared were engaged in criminal activity, and therefore their pat-downs may too have been unreasonable.

At the sounds of police radios, Raymond left his bedroom, turned on the entryway lights, and walked out his front door.  (Raymond Dep. 28:3–11; 39:3–11.) He did so voluntarily, not at the deputies' urging.  Moreover, he was wearing slippers and a sweatshirt—the exact attire one would expect for someone roused from the suburban quiet in the middle of the night.  (*Id.*)  Based on his behaviors and attire, Defendants cannot categorically say that they thought Raymond Kovacic was armed and dangerous.  Likewise, Jared exited his home in nothing more than boxer shorts and a t-shirt—not many places to hide a weapon with that outfit.  (Jared Decl. ¶ 28.)

Defendants' Motion for Summary Judgment as to the Fourth Amendment Unreasonable Search claim is **DENIED**.

**E. Claims Against Local Government: Failure to Train; Unlawful Policy, Practice, or Custom (under § 1983)**

A law enforcement agency may be liable under § 1983 for failing to train its officers, but only where that failure to train amounts to a "deliberate indifference" to a plaintiff's civil rights.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  To prove deliberate indifference, a plaintiff "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim." *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008).  Similarly, in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that a showing of an unconstitutional "custom, practice, or policy" may open a municipality to § 1983 liability.  *Id.* at 694.  To succeed on a *Monell* claim, a plaintiff must establish that (1)

17

1    the law enforcement officers acted under color of law; (2) the officers' actions

2    deprived the plaintiff if his/her rights as afforded by the Constitution; and (3) the

3    officers acted pursuant to an official policy or longstanding practice or custom. *Oviatt*

4    *v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

5          The Court finds as a matter of law that the LASD and its officers did not act

6    with deliberate indifference to Plaintiffs' civil rights, and that the County of Los

7    Angeles does not enforce an unconstitutional custom, practice, or policy.  Defendants

8    have established that, currently and at the time of the incident, the LASD has an

9    express policy requiring that its officers not willfully violate state or federal law.

10   (Def. SUF ¶ 80.)  Furthermore, each officer is trained on the appropriate means by

11   which investigatory stops are to be conducted and taught the requirements under the

12   reasonable suspicion and probable cause standards.  (*Id.* ¶ 84.)  Plaintiffs have not

13   offered any genuine facts to the refute Defendants' policies, and there is no suggestion

14   that the policies or training practices themselves instruct the officers to engage in

15   unlawful conduct.  Where the opposing party fails to challenge the facts asserted by

16   the moving party in the manner required by Federal Rule of Civil Procedure 56(c), the

17   Court may consider the facts undisputed for purposes of the motion and grant

18   summary judgment where the movants are so entitled.  FRCP 56(e)(2)–(3); Local Rule

19   56-3; *Beard v. Banks*, 548 U.S. 521, 527 (2006) (failure to specifically challenge facts

20   identified in moving party's statement will be deemed admission of those facts).

21   Accordingly, Defendants' Motion for Summary Judgment as to the claims against the

22   County of Los Angeles and the LASD is **GRANTED**.

23         **F. First Amendment Violation**

24         The First Amendment guarantees freedom from government retaliation for

25   protected speech.  *Blair v. Bethel Schl. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)

26   (citations omitted).  To recover under § 1983 for such retaliation, a litigant must

27   prove: (1) that he engaged in constitutionally protected activity; (2) as a result, he was

28   subjected to adverse action by the defendant that would chill a person of ordinary

firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.  *Id.*; *see also Pinard v. Clatskanie Schl. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006).

Plaintiffs allege that the July 31, 2013 events were done in retaliation for their protestations and challenges to the sheriffs' authority.  (SAC ¶¶ 112–13.)   The Court is not persuaded, and finds as a matter of law that Defendants did not retaliate against Plaintiffs for their constitutionally protected speech.   Tellingly, Defendants had no contact with the Kovacics before investigating the supposed burglary, and Plaintiffs offer no facts to support an argument that the deputies escalated their potentially injurious behaviors only after the men protested their detention.   Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to the First Amendment claim.

### G. Violation of California Civil Code Section 52.1

Plaintiffs argue that Defendants violated California Civil Code section 52.1 (Bane Act), which bars any attempt to interfere with the free exercise of one's constitutionally-protected freedoms by means of threat, intimidation, or coercion.  Cal. Civ. Code § 52.1(a).   Plaintiffs claim that Defendants' verbal threats violated their First and Fourth Amendment rights and run afoul of the state law.  (SAC ¶¶ 118–21.) However, § 52.1 aims to address deliberate or spiteful actions, not those amounting to mere negligence.  *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947, 958 (2012). Plaintiffs offer no specific arguments refuting Defendants' motion as to this state law claim.   As above, the Court may consider the movant's facts undisputed for purposes of summary judgment.  FRCP 56(e)(2)–(3).

The Court **GRANTS** Defendants' Motion for Summary Judgment as to the Bane Act claim.   While Defendants' alleged threats to send an attack dog into the Kovacic home and their retorts to "shut the fuck up" could be threats under the statute, they alone cannot support a Bane Act claim.  (*See* Raymond Dep. 98:2–6; Filipovic

Decl. ¶ 31.)   Under the Act, "[s]peech alone is not sufficient to support an action brought pursuant to subdivision (a) or (b), except upon a showing that the speech itself threatens violence against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property and that the person threatening violence had the apparent ability to carry out the threat." Cal. Civ. Code § 52.1(j); *see also Shoyaye*, 203 Cal. App. 4th at 959.  First, a crass invective falls far short of the "threat of violence" threshold under the Act, leaving only the threat to release an attack dog as support for the Bane Act claim.  (Filipovic Decl. ¶ 31.)  Even if taken as true, a threat to release an attack dog is insufficient where the person against whom the threat is made (Weinberger, the remaining guest inside the home) did not hear the threat—and indeed was asleep—and therefore could not possibly reasonably fear that violence would be carried out.

### H. Defendants' Claims for Qualified Immunity

Under the doctrine of qualified immunity, government actors are immune from suit for civil damages unless their conduct violates clearly established constitutional or statutory rights of which the officers should have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1981).  The doctrine calls for a two-step analysis.  First, courts are to ask whether a constitutional right has been violated and, if so, whether it is a clearly established right of which a reasonable officer should know.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Even where an officer is mistaken as to the law, that officer will be qualifiedly immune where that misapprehension was reasonable under the circumstances.  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  However, where the law is clearly established, mistakes of fact will *not* give rise to qualified immunity.  *Harlow*, 457 U.S. at 818–19.

The Court addresses the first step in the qualified immunity dance and finds that, because there is a genuine issue of material fact as to whether Defendants' violated Plaintiffs' Fourth Amendment rights.  As evidenced above, Defendants' lack

of reasonable suspicion calls into question the reasonableness of their actions. While Defendants may have originally had the requisite level of suspicion when they exited their patrol vehicle to investigate, their suspicions were unsupported after deducing that, under the totality of the circumstances, Raymond Kovacic was not burgling his own home. Without the required basis for the detention, pat-down, or sweep of the home, their actions were unconstitutional and qualified immunity thus inapplicable.

Even if this Court took the qualified immunity analysis out of sequence and first asked if the Defendants' actions ran contrary to clearly established law, *id.*, the Court's decision remains. Every law enforcement officer is on notice that searches and detentions without the proper evidentiary basis clearly violate the Fourth Amendment. *Terry*, 392 U.S. at 23–27. Furthermore, further elaboration on the applicable legal standard is unnecessary where, as here, the question of whether Defendants' violated Plaintiffs' constitutional rights is fact-dependent. *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006) (holding that the purpose of the "clearly established law" prong, which protects officers from liability where the law is unclear, is not served "where the Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts.") Accordingly, the Court **DENIES** Defendants' qualified immunity defense.

## I. Summary Judgment as to Defendants LaBerge, Davoren, Williams, Koerner, Myers, and O'Neal

Finally, Defendants argue that Plaintiffs have not sufficiently proven any wrongdoing as to certain named Defendants. The Court agrees as to Defendants LaBerge and Davoren, and accordingly **GRANTS** Summary Judgment as to all claims against these Defendants. However, the Court **DENIES** the Motion as to Defendants Williams, Koerner, Myers, and O'Neal.

Plaintiffs allege that Defendants LaBerge and Davoren should be held liable because they "personally participated in an internal investigation of this matter." (Plaintiffs' Statement of Genuine Material Facts in Opp. to Defs.' Mot. For Summ. J.

¶ 75, ECF No. 67.)  Beyond this bare allegation, Plaintiffs offer no factual support or even argument as to why the Defendants should remain.  Defendants have satisfied their burden of demonstrating the absence of facts necessary to support Fourth Amendment or state law liability as to these two Defendants, who were not even present at the Kovacic home on July 31, 2013.  (*Id.*)  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Accordingly, the Court grants summary judgment as to all claims against Defendants LaBerge and Davoren.

In their Reply, Defendants also argue that Defendants Myers, Koerner, and O'Neal never had any contact with the Plaintiffs, and therefore any claims against them should be found adjudicated as a matter of law.  (Def. Reply 4–5, ECF No. 80.)  The Court disagrees.  Both parties agree that the officers were present on the night in question.  (Def. SUF ¶ 24.)  Jared Kovacic states that he saw several officers pointing their service weapons in his face during his detention.  (Jared Dep. 68:20–25; Plaintiffs' Jared Dep. 69:1–15.)  These officers may have been Myers, Koerner, and O'Neal—and if they were not, the factfinder can be trusted to deduce their liability, or lack thereof.

## VI.   CONCLUSION

For the above reasons, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

March 18, 2016

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**